**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| IN RE: ) | |
| BRIAN D. SQUYARS, ) | |
| And ) | Case No. 08-35280-DOT |
| CAROLYN J. SQUYARS, ) | Chapter 7, converted from chapter 13 |
| ) | |
| Debtors. ) | |
| _____) _____ | |
| ) | |
| DAVID L. BATKINS ) | |
| and ) | |
| TAMMY C. BATKINS ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Adv. Pro. No. 09-03124-DOT |
| ) | |
| BRIAN D. SQUYARS, ) | |
| and ) | |
| CAROLYN J. SQUYARS ) | |
| ) | |
| Pro se Defendants. ) | |

**MEMORANDUM OPINION**

On January 14, 2010, the court held a trial on the complaint for determination of dischargeability of debt filed by plaintiffs David L. and Tammy C. Batkins. The complaint sought, pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6),[1] a determination that the obligations owed to plaintiffs by debtors Brian D. and Carolyn J. Squyars were nondischargeable. The complaint also sought an award of damages, plus pre-judgment and post-judgment interest as well as attorney's fees and costs.

Debtors failed to appear at trial. Pursuant to Federal Rule of Bankruptcy Procedure 7055, making Rule 55 of the Federal Rules of Civil Procedure applicable in adversary proceedings, the court conducted an evidentiary trial to determine the amount

---

[1] Title 11 of the United States Code contains the Bankruptcy Code. Further references to provisions of the Bankruptcy Code will be by section number only, e.g. § 523(a)(2)(A).

1

of damages and to establish the truth of any allegation by evidence. At the conclusion of that trial, the court took Count I of the complaint, based upon § 523(a)(2)(A), and Count II, based upon § 523(a)(4), under advisement. The court ruled that Count III, based upon § 523(a)(6), would be dismissed.

## PARTIES AND PROCEDURAL HISTORY

Debtors filed a voluntary petition under chapter 13 of the Bankruptcy Code on October 23, 2008. The case was converted to chapter 7 on January 14, 2009. Debtors received a discharge on June 4, 2009. The chapter 7 trustee filed a report of no distribution to unsecured creditors on December 10, 2009. Plaintiffs initiated this adversary proceeding on June 1, 2009.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) and (b). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (I). Venue is appropriate in the court pursuant to 28 U.S.C. §§ 1408 and 1409.

Upon consideration of the evidence and arguments of counsel, the court finds that certain debts owed to plaintiffs by debtors are nondischargeable. Judgment will be awarded to plaintiffs and against debtors.

## FACTS

Plaintiffs and debtors opened Channel Bass Restaurant on North Carolina's Outer Banks at some point in the spring of 2008. The business was closed on or about September 2, 2008. The facts below outline the history of the doomed business venture.

Plaintiffs became acquainted with debtors because plaintiffs had been patrons of Island Seafood and Riptides Seafood Restaurant, Inc., two businesses previously owned by debtors. Prior to December 2007, Mr. Squyars informed Mr. Batkins that debtors were

2

seeking to sell Riptides Restaurant and open a restaurant on the Outer Banks of North Carolina, fashioned after debtors' Riptides Restaurant.

The parties entered into discussions as to whether plaintiffs would invest in the new Outer Banks restaurant. Neither of the plaintiffs was sophisticated in business and neither had previous experience in the restaurant business. During the course of the discussions, debtors represented that they had sold the Riptides Restaurant. Despite the fact that after the sale debtors purchased a new boat and made improvements to their home, debtors in fact had substantial financial problems. They were still indebted for obligations arising from the operation of Riptides Restaurant.[2] Mr. Squyars and Riptides Seafood Restaurant had been sued by John Robert Greenwood, IV, in December of 2007 for an obligation of $125,000.00 arising out of a personal loan. The Emerson Companies, LLC, filed a warrant in debt against debtors in April of 2008, seeking judgment in the amount of $14,182.68 plus interest, costs and attorney's fees. On May 2, 2008, the Virginia Department of Taxation filed a notice of personal liability against Mr. Squyars for $27,057.62, representing unpaid sales and use taxes arising from the Riptides Seafood Restaurant for periods ending in 2007 or before.

Mr. Squyars informed Mr. Batkins that if plaintiffs wanted to obtain an ownership interest in the new restaurant, plaintiffs would have to provide five thousand dollars, which Mr. Squyars represented would be deposited into a company account and used for advertising and promotion of the new restaurant. On December 7, 2007, plaintiffs paid Mr. Squyars $1,000.00, and on January 17, 2008, plaintiffs paid him an additional $4,000.00. Prior to paying what they believed was their capital contribution into the new

---

[2] This was evidenced in part by credit card payments to Capital One and First Equity referenced in footnote 3 below.

3

company, plaintiffs were advised by Mr. Squyars that the new venture would be organized as a North Carolina Limited Liability Company (LLC). However, the funds paid by plaintiffs were not deposited into a company account but were instead deposited into a personal checking account at Wachovia Bank jointly held by debtors.

On January 18, 2008, the parties entered into a written contract by which plaintiffs agreed to "contribute financially" to the Channel Bass Restaurant business. An LLC would be created and named "Hatteras Sands Venture, LLC." Debtors acknowledged the receipt of $5,000.00 from plaintiffs. The parties agreed that plaintiffs' percentage of membership in the venture would be determined once the total capitalization amount was completed. There is no evidence that such a determination was ever formally made.

On numerous occasions from January to August 2008, debtors referred to the business entity as an LLC. In February 2008, plaintiffs and debtors traveled from Richmond, Virginia, to Hatteras, North Carolina, during which debtors numerous times represented that the newly organized LLC was called "Washed-a-Shore Ventures LLC." Debtors further represented that Mrs. Squyars would be the president of the new company and that Mr. Batkins would be its secretary. In reality, no LLC was ever formed. Without plaintiffs' knowledge or consent, debtors engaged the services of an attorney in North Carolina who drew up articles of incorporation for Washed-A-Shore Ventures, Inc. and caused them to be filed with the North Carolina Secretary of State on March 10, 2008. It appears that no further corporate formalities were observed with regard to Washed-A-Shore Ventures, Inc., and no stock in the company was ever issued.

4

After plaintiffs had made their payment of $4,000.00 in January 2008, Mr. Squyars represented to them that the business would require an additional $15,000.00 for startup costs because another investor had backed out and no other funds were available. Mr. Squyars advised plaintiffs that they could secure a loan from East Carolina Bank. Accordingly, on February 9, 2008, debtors and plaintiffs executed a line of credit with East Carolina Bank in the amount of $25,000.00. While Mr. Batkins expressed concern at the additional $10,000.00, he was reassured by Mr. Squyars that it would be prudent to have those funds available should they ever be needed. The commercial line of credit agreement and note were executed by all four parties individually and not in the name of any business entity. All parties agreed that any funds drawn on the line of credit would be used solely for the new business venture, and the loan documents with East Carolina Bank contained a provision to that effect as well.

In connection with the line of credit, the parties also opened a checking account with overdraft protection at East Carolina Bank. The account was to be used by the business. Mr. Squyars maintained exclusive control of the checkbook, and all statements for the checking account and line of credit were mailed to a post office box also controlled exclusively by Mr. Squyars. Despite numerous requests by plaintiffs, debtors never granted plaintiffs access to the bank records and documents.

By March 10, 2008, $24,000.00 had been drawn on the line of credit with East Carolina Bank. When the funds were drawn from the line of credit account, they were deposited into the checking account with East Carolina Bank. However, instead of using those funds exclusively for the business, debtors also used those funds to cover their own personal debts and expenses. Payments for debtors' personal Verizon debts, GMAC

5

debts, credit card debts and debts arising from the former Riptides Restaurant that were paid from the East Carolina Bank account totaled $6,677.55.[3] There were also expenditures of $7,590.00 for which no explanation is available from the evidence before the court. Those withdrawals could have been for salary draws by Mr. Squyars, which was agreed upon by the parties to be $4,000.00 per month, or could have been associated with no legitimate business purposes. The court notes that while there were impermissible withdrawals from the account, the account was heavily used for the payment of legitimate business expenses as well.

During the time period of the execution of the East Carolina Bank line of credit, debtors were negotiating with EWN Investments, Inc., for the lease of the building in which the Channel Bass Restaurant was to operate. Debtors were also negotiating with EWN Investments for a loan to cover startup costs for the new business. On or about February 20, 2008, Brian Squyars, acting on behalf of an entity named "Washed-A-Shore Ventures, Inc." entered into a lease agreement with EWN for the restaurant building and also executed a promissory note in the amount of up to $30,000.00 from EWN Investments. The actual amount was to depend upon the amounts actually advanced pursuant to the promissory note. There is no evidence as to how much was actually advanced, although plaintiffs testified that some of the restaurant's bills were forwarded to EWN for payment. Both debtors personally guaranteed both the note and the lease

---

[3] Payments included $500.00 on February 14, 2008, to Mr. Squyars' personal Capital One account; $921.04 on February 22, 2008, to Island Seafood's Capital One account; $235.49 on May 2, 2008, to a Capital One account (the business had no Capital One account as of that date); $700.00 on February 19, 2008, to a Riptides Restaurant First Equity account; $1,025.00 on March 4, 2008, to a Riptides Restaurant First Equity account; $694.34 on May 2, 2008, to GMAC for payment on a vehicle (the business owned no vehicles); $1,388.68 on August 12, 2008, to GMAC; $650.00 on April 30, 2008, for a transaction noted on the check register as "truck payment"; $276.43 on July 28, 2008, and $286.57 on September 3, 2008, to Verizon for debtors' personal telephone service.

6

obligations. Plaintiffs were never informed of the existence of this separate loan, were never obligated on it, and did not learn of it until after the failure of the business.

Mr. Squyars also caused Mr. Batkins to sign a one-page application to procure membership in the Cape Hatteras Electric Cooperative so that the restaurant would have electricity. However, the application also contained a second page that Mr. Batkins never saw. That page contained a personal guaranty which Mr. Squyars executed with an illegible signature (which the evidence reveals was the regular signature of Mr. Squyars). It appears that Mr. Squyars then allowed that illegible signature to be notarized as the signature of Mr. Batkins. The facts surrounding the execution of the guaranty are somewhat unclear. Regardless, the Electric Cooperative took the position after the failure of the business that the amounts due it on the restaurant account were the responsibility of Mr. Batkins and that Mr. Batkins' signature as business representative bound him personally. Mr. Batkins eventually paid the Electric Cooperative the sum of $4,385.73 on account of the debt.

In June of 2008, Mr. Squyars approached plaintiffs and suggested that the parties obtain a credit card from Capital One to be used for expenses associated with the restaurant. The four individuals each had a credit card with a $5,000.00 limit. However, Mr. Squyars used his card for non-business expenses, including online gambling and the purchase of items from "web-support24.com/bed." The online gambling debts were removed from the Capital One bills, but the other personal charges remain as a personal obligation of plaintiffs, totaling $1,023.00.

On or about September 2, 2008, Mr. Batkins received a voice mail message from Mr. Squyars requesting that plaintiffs infuse additional funds into the business. If no

7

funds were received, Mr. Squyars would be forced to close the restaurant. Plaintiffs declined to do so, and so on or about September 2, 2008, debtors closed the Channel Bass Restaurant.

Beginning in October 2008, East Carolina Bank began making demands on plaintiffs for payment on the East Carolina Bank line of credit. While attempting to determine what had happened with the business, Mr. and Mrs. Batkins made interest payments to East Carolina Bank in the amount of $242.37 on October 10, 2008, $242.37 on November 10, 2008; and, $242.37 on December 10, 2008. On March 10, 2009, plaintiffs received a final payoff and demand for payment on the balance of the line of credit and for an overdraft on the Washed-A-Shore checking account. On March 13, 2009, plaintiffs paid East Carolina Bank $24,503.44 on the line of credit and $519.55 for the overdraft on the related checking account.

Additional findings of fact are included in the discussion below.

## **CONCLUSIONS OF LAW**

Section 523 of the Bankruptcy Code excepts from an individual debtor's discharge certain categories of debts. In determining whether a debt is excepted from discharge, the court is mindful of the broader purpose of the drafters of the Bankruptcy Code, that of giving a fresh start to unfortunate debtors. Therefore, courts have construed exceptions to discharge narrowly so as not to wrongfully deprive debtors of that fresh start. *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999). On the other hand, debtors who have engaged in behaviors sanctioned by Congress in § 523 must be held to the consequences of their wrongful actions. The bankruptcy system must balance these two purposes. In weighing the rights and liabilities of debtors and creditors when § 523 of the Bankruptcy Code is at issue, the burden of proof is usually on the creditor who asserts

8

its debt should be excepted from discharge. The standard of proof for nondischargeability is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 112 L.Ed.2d 775 (1991). In this case, therefore, the burden of proof is on plaintiffs to prove by a preponderance of the evidence that the debts at issue should be excepted from discharge. At issue in this adversary proceeding are §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6).

Before examining each exception individually, the court addresses plaintiffs' argument that they would not have entered into business with debtors had they known of Mr. Squyars' prior criminal history[4] or the other financial problems that debtors had.[5] Plaintiffs therefore argue that all amounts they expended upon this doomed business venture should be declared nondischargeable. However, investing in a business venture entails an element of risk.[6] Plaintiffs have not pointed to any provision of the law that would have required debtors[7] to make an overt disclosure of their previous financial troubles. Plaintiffs undertook only the slightest investigation into the financial status of debtors or their previous businesses. Investigation would have revealed at least some of debtors' financial predicaments. The court cannot place the entire blame on debtors in

---

[4] On July 30, 2003, Mr. Squyars was sentenced by the Circuit Court of Henrico County, VA, to incarceration a term of 30 years for forgery and embezzlement. The sentence was suspended provided that Mr. Squyars served a term of 48 months. He was further ordered to pay restitution in the amount of $333,687.00.

[5] They were still indebted for obligations arising from the operation of Riptides Restaurant, as seen by credit card payments to Capital One and First Equity referenced in footnote 3 above. Mr. Squyars and Riptides Seafood Restaurant had been sued by John Robert Greenwood, IV, in December of 2007 for an obligation of $125,000.00 arising out of a personal loan. The Emerson Companies, LLC, filed a warrant in debt against debtors in April of 2008, seeking judgment in the amount of $14,182.68 plus interest, costs and attorneys fees. On May 2, 2008, the Virginia Department of Taxation filed a notice of personal liability against Mr. Squyars for $27,057.62, representing unpaid sales and use taxes arising from the Riptides Seafood Restaurant for periods ending in 2007 or before.

[6] In fact, the business document signed on January 18, 2008, between the parties contained the provision that "[a]ll parties agree and acknowledge that there is an inherent risk associated with any business venture and there are no promises or guarantees of losses or gains that may result from this agreement and venture, including the initial or subsequent amounts of contributed capital."

[7] Reference to plaintiffs or debtors as plural does not preclude the possibility that only one individual plaintiff or defendant made a particular statement or took any particular action.

this particular situation. However, as set forth below, debtors will be held responsible for their improper acts in their business relationship with plaintiffs.

Section 523(a)(6)

At trial, the court found that plaintiffs had not proven their case with respect to § 523(a)(6), which provides that an individual debtor is not entitled to discharge an obligation for "willful and malicious injury by the debtor to another entity or to the property of another entity." Judge St. John of this court has issued a scholarly and comprehensive opinion summarizing the status of the law under § 523(a)(6). In *Dominion Virginia Power v. Robinson (In re Robinson),* 340 B.R. 316 (Bankr. E.D. Va. 2006), the court was forced to decide whether a debtor's receipt of electric power for significantly less than he should have paid (as a result of meter tampering by parties unknown) constituted a debt that was nondischargeable because of willful and malicious injury. The court provided a lengthy summary of case law surrounding this exception, using the decision of the United States Supreme Court in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), as the starting point of its analysis. In *Geiger*, the Supreme Court concluded that an exception to discharge under § 523(a)(6) required an act done with an actual intent to cause injury:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, . . . the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend " the consequences of an act," not simply "the act itself."

*Id.* at 61-62, 118 S.Ct. 974 (citation omitted).

10

Subsequent to the Supreme Court's issuance of *Geiger*, this court has had further opportunity to comment upon the requirements of § 523(a)(6). In *Johnson v. Davis (In re Davis)*, the court stated that:

> Malice does not mean the same thing for nondischargeability purposes under § 523(a)(6) as it does in contexts outside of bankruptcy. In bankruptcy, debtor may act with malice without bearing any subjective ill will toward plaintiff creditor or any specific intent to injure same. *See In re Stanley*, 66 F.3d at 667 *citing St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1008-09 (4th Cir. 1985). The Fourth Circuit defines malice as an act causing injury without just cause or excuse. *See In re Powers*, 227 B.R. at 73.[8]
>
> Debtor's subjective mind set is central to the inquiry as to whether debtor acted deliberately in knowing disregard of a creditor's rights in property. In fact, a plaintiff creditor can even establish malice on an implied basis from a showing of debtor's behavior, as well as a presentation of the surrounding circumstances. *See St. Paul Fire & Marine Ins. Co.,* 779 F.2d at 1010 ("[i]mplied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under ... § 523(a)(6)."); *Hagan v. McNallen ( In re McNallen*), 62 F.3d 619, 625 (4th Cir. 1995). What is required is that plaintiff prove that debtor's injurious act was done deliberately, intentionally and with knowing disregard for plaintiff's rights. *See In re Stanley,* 66 F.3d at 667.

262 B.R. 663, 670-71 (Bankr. E.D. Va. 2001).

As this court ruled from the bench, the facts here do not rise to the level required by *Geiger* for excepting a debt from discharge under § 523(a)(6). The court is unpersuaded that debtors intended actually to harm plaintiffs. Rather, it appears that this was a business venture gone wrong. There is not sufficient evidence before the court to show that debtors, in entering into the business with plaintiffs, had the intent to injure plaintiffs. Neither was it proven that debtors should have known with reasonable certainty that the business would fail and plaintiffs would lose their investment. The losses incurred by plaintiffs arising from debtors' actions are thus not nondischargeable under § 523(a)(6).

---

[8] *Branch Banking and Trust Co. v. Powers (In re Powers)*, 227 B.R. 73 (Bankr. E.D. Va. 1998).

§ 523(a)(2)(A)

Plaintiffs base a portion of their complaint upon § 523(a)(2)(A). That section states that debts are nondischargeable if they are "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by - false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

Here, in order to prevail in a claim under § 523 (a)(2)(A), plaintiffs must establish:

(1) that debtors made misrepresentations or committed other fraud;

(2) that at the time, debtors knew the conduct was fraudulent;

(3) that debtors' conduct was with the intention and purpose of deceiving or defrauding plaintiffs;

(4) that plaintiffs relied on debtors' representations or other fraud; and

(5) that plaintiffs sustained loss and damage as the proximate result of the representations or fraud.

*Western Union Corp. v. Ketaner (In re Ketaner)*, 154 B.R. 459, 464-465 (Bankr. E.D. Va. 1992); *Kendrick v. Pleasants (In re Pleasants)*, 231 B.R. 893, 897 (Bankr. E.D. Va. 1999), aff'd, 219 F.3d 372 (4th Cir. 2000); *Marunaka Dainichi Co. v. Yamada (In re Yamada)*, 197 B.R. 37 (Bankr. E.D. Va. 1996).

In examining the § 523(a)(2)(A) claim, the court will consider each type of debt separately. First, the court addresses the $5,000.00 initially paid by plaintiffs that was to have been used as startup funds and to cover advertising costs. Debtors represented to plaintiffs that they would place those funds in an operating account for the restaurant.

12

Debtors did not, in fact, use those funds for business purposes. Instead, they deposited them into their own personal bank account. When the East Carolina Bank accounts were opened in February 2008, there was no transfer of the $5,000.00 advanced by plaintiffs into the checking account. Thus, the court finds that plaintiffs have carried their burden of proving the initial $5,000.00 was obtained by fraud and will find that payment nondischargeable as to both debtors.

With respect to the debt to the Cape Hatteras Electric Cooperative, plaintiffs argue that Mr. Batkins would not have signed the application had he known that there was a second page requiring an individual guaranty. They argue that he had been under the impression that his signature was being provided as a representative of the business only. Examining the requirements of § 523(a)(2)(A), the court finds that Mr. Squyars made a misrepresentation to Mr. Batkins by presenting him with the application for signature as Mr. Batkins was driving off and by failing to provide him with the second page of the document, which contained the personal guaranty provision. Mr. Squyars undoubtedly knew his conduct was fraudulent when he presented himself at the bank and allowed his signature on the guaranty line to be notarized as that of Mr. Batkins. The intent of the conduct was to persuade Mr. Batkins to incur the personal liability without knowing that he was personally guaranteeing the obligation. Mr. Batkins, relying on Mr. Squyars's representations, believed himself to be signing as a business representative. As a result, he became obligated to the Cape Hatteras Electric Cooperative in the amount of $4,385.73. Plaintiffs having satisfied the requirements of § 523(a)(2)(A), the court finds that this amount is nondischargeable as to Mr. Squyars only, the evidence not revealing any participation by Mrs. Squyars.

13

As to the East Carolina Bank line of credit and checking account, plaintiffs argue that debtors' representations that the East Carolina Bank accounts were to be used only for business purposes induced them to enter into the line of credit. Plaintiffs point out that debtors in fact almost immediately used the accounts for personal purposes. Plaintiffs further state that they would not have entered into the East Carolina Bank loan had they known that debtors would have used the loan funds partly for their own personal purposes.

The court cannot not find that debtors made misrepresentations as to the use of line of credit in order to induce plaintiffs to obligate themselves on that line of credit. The evidence shows that debtors had an intent to operate a business, which was the real reason that the line of credit was entered into by the parties. In evaluating the evidence, the court notes that not all of the expenditures of the funds drawn down from the line of credit were for debtors' personal purposes. In fact, a large number of the transactions that flowed through the business checking account were for business purposes. Additionally, the entire amount drawn upon the East Carolina Bank line of credit was not appropriated by debtors for their personal use. This does not support the claim that debtors intended all along to use the account for their own personal purposes.

The court's finding does not mean that all amounts drawn by debtors on the line of credit are dischargeable. Draws that represented debtors' improper use of the funds may not be dischargeable. Their dischargeability will be determined under § 523(a)(4), barring the discharge of debts incurred by "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

14

Similarly, the court will evaluate whether the $1,023.00 obligation incurred by plaintiffs to Capital One for Mr. Squyars' charges for personal items is nondischargeable under § 523(a)(4). Therefore, the court does not determine whether the representations made by debtors as to the purpose of the Capital One account were fraudulent and induced debtors to obligate themselves on the account.

Finally, plaintiffs assert that the silence of debtors as to their financial situation created a false representation that was relied upon by plaintiffs, thus making the entire line of credit debt nondischargeable. The argument hinges on the supposition that debtors knew that they had created a false impression and caused debtors to act in reliance upon that false impression. While this might be a viable argument in other cases, here there is not sufficient evidence to support it. The court finds the case of *Household Finance Corp. v. Kahler (In re Kahler)*, 187 B.R. 508 (Bankr. E.D. Va. 1995), cited by debtors, to be inapposite.

§ 523(a)(4)

The court now turns to plaintiffs' argument that the debts are nondischargeable under § 523(a)(4). That section bars the discharge of debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

Embezzlement. This Court has defined "embezzlement" as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Johnson v. Davis (In re Davis),* 262 B.R. 663, 671 (Bankr. E.D. Va. 2001)*, citing Weigend v. Chwat (In re Chwat),* 203 B.R. 242, 248 (Bankr. E.D. Va. 1996).

The evidence presented shows that debtors caused at least $6,677.55 to be withdrawn from the business account and subsequently used those funds for personal

15

expenses. That behavior constitutes embezzlement under the *Johnson* test above. The parties had unquestionably all agreed that the funds in the East Carolina Bank accounts were to be used only for business purposes. Equally unquestionable is the fact that the $6,677.55 of expenditures to Verizon, Capital One, GMAC and First Equity listed above were not used by debtors for business purposes. The funds came into debtors' hands lawfully but then were appropriated for debtors' personal use. That appropriation constitutes embezzlement, and the debt to plaintiffs is therefore nondischargeable under § 523(a)(4).

The evidence does not show what the $7,590.00 of unexplained expenses represent, and thus the court cannot find that those expenses were embezzlement. There was testimony at trial that withdrawals in even amounts represented draws taken by debtors for personal expenses, but no evidence was presented to corroborate this assertion. At least some of those amounts, the $4,000.00 check on February 15, 2008, for example, could have been for debtors' $4,000.000 salary, which the parties had agreed upon. The court cannot simply assume, without more, that the amount of the check itself is incontrovertible evidence of an improper personal expenditure.

The court does find that had the debtors not used the East Carolina Bank checking account for personal purposes, there would have been no overdraft. The creation of the overdraft and the receipt of funds from the overdraft was an improper taking of the overdraft protection of the checking account. Therefore, the $519.55 overdraft paid by plaintiffs was a result of debtors' embezzlement and is nondischargeable.

Mr. Squyars' use of the Capital One business credit cards for personal expenses constituted embezzlement as well. He violated the terms of the agreement with plaintiffs

16

that the Capital One cards obtained in the summer of 2008 were to be used for business purposes only. He came into the credit account funds lawfully but then used them for personal expenses. That constituted an improper appropriation of funds borrowed from Capital One. As a result, plaintiffs paid $1,023.00 on that account to cover personal charges made by debtor Brian Squyars in breach of that understanding. The $1,023.00 for which plaintiffs are liable on that account is thus nondischargeable as to Mr. Squyars only under § 523(a)(4) .

Attorney's fees and costs

As required by the Federal Rules of Bankruptcy Procedure, in their complaint, plaintiffs have also made a request for an award of attorney's fees and costs.[9] They presented evidence at trial that they had incurred attorney's fees in the amount of $14,055.00 and costs in the amount of $862.00 prior to the trial date. In Virginia, "in the absence of a statute or contract to the contrary, a [Virginia] court may not award attorney's fees to the prevailing party." *Prospect Dev. Co. v. Bershader,* 258 Va. 75, 92, 515 S.E.2d 291, 300 (Va. 1999); *Elrod v. Bowden (In re Bowden),* 326 B.R. 62, 100 (Bankr. E.D. Va. 2005). In Virginia, generally an award of attorney's fees must be supported by statute or contract. There are a few exceptions to the rule; the relevant one here relates to fraud actions. In *Bershader*, the Supreme Court of Virginia allowed reasonable attorney's fees to be awarded to a prevailing party who had proven fraud. 258 Va. at 300-01. See also *C.F. Trust, Inc. v. First Flight Ltd. P'ship,* 359 F.Supp.2d 497, 501 (E.D.Va.2005); *Wooten v. Wooten (In re Wooten)*, 423 B.R. 108, 137 (Bankr. E.D. Va. 2010).

---

[9] Pursuant to Rule 8(b) of the Federal Rules of Bankruptcy Procedure, an "request for an award of attorney's fees shall be pleaded as a claim in a complaint, cross-claim, third-party complaint, answer, or reply as may be appropriate."

17

The exception for fraud in *Bershader* must be narrowly interpreted, in light of the caution of the Supreme Court of Virginia that "[w]hen deciding whether to award fees, the chancellor must consider the circumstances surrounding the fraudulent acts and the nature of the relief granted to the defrauded party." 285 Va. at 92, 515 S.E.2d at 301. In *Bershader*, the Virginia Supreme Court found that the defendants had engaged in "callous, deliberate, deceitful acts that the chancellor described as a pattern of misconduct." *Id*. In this case, the actions of debtors were consistent with a pattern of misconduct, as illustrated by the previous financial and criminal history of debtors. In addition, in their answer to the complaint, debtors did not oppose the request for an award of attorney's fees, nor did they appear in court to voice their opposition. Therefore the court will award attorney's fees to plaintiff in the amount of $14,055.00 and costs in the amount of $862.00.[10]

The court finds no basis for an award of pre-judgment interest; post-judgment interest shall accrue on the judgment pursuant to the provisions of 28 U.S.C. §1961.

## CONCLUSION

The court finds the following debts to be nondischargeable as to both debtors:

$5,000.00, representing the initial investment amount paid by plaintiffs to debtors; $6,677.55, representing amounts withdrawn by debtors for personal purposes from amounts in the East Carolina Bank business checking account; $519.55, representing the amount spent by plaintiffs to cover an overdraft in the East Carolina Bank business checking account; and $14,917.00, representing attorney's fees and costs.

The following debts are nondischargeable as to debtor Brian Squyars only:

---

[10] Plaintiffs also argue that an award of attorneys' fees is appropriate based upon the Virginia Consumer Protection Act, Va. Code § 59.1-204(B). As plaintiffs have made no claim against debtors under that act, the court thus declines to analyze its applicability.

18

$1,023.00, representing the amount spent by plaintiffs to pay Capital One for amounts improperly spent by debtor Brian Squyars with a business credit card; and $4,375.83, representing amounts spent by plaintiffs to repay the debt to the Cape Hatteras Electric Cooperative.

A separate order will be entered 1) excepting the amount of $27,114.10 from discharge as to both debtors and 2) excepting the additional amount of $5,398.83 from the discharge of Mr. Squyars.

DATED this 30th day of March, 2010.

BY THE COURT:

/s/ Douglas O. Tice Jr.
_____
DOUGLAS O. TICE JR., Chief Judge
United States Bankruptcy Court

Copies to:

Thomas H. Gays, II
Saunders, Cary & Patterson
9100 Arboretum Parkwyy
Suite 300
Richmond, VA 23236
*Attorney for Plaintiffs*

Brian D Squyars
Carolyn J Squyars
13308 Carters Way Place
Chesterfield, VA 23838
*Debtors*

Roy M. Terry, Jr.
DurretteBradshaw, P.L.C.
P.O. Box 2188
Richmond, VA 23218-2188
*Chapter 7 Trustee*

Robert B. Van Arsdale
Office of the U. S. Trustee
701 East Broad Street, Suite 4304
Richmond, VA 23219

Shreen N. Mahmoud
Harry Jernigan CPA Attorney, P.C.
258 N. Witchduck Road, Suite C
Virginia Beach, VA 23462

20